534

John F. Ryan, Appellee, v. Harry's New York Cabaret, Inc., Appellant.

Gen. No. 39,768.

Opinion filed February 2, 1938.

ANDREW J. FARRELL, of Chicago, for appellant; ALLAN J. MOORE, of Chicago, of counsel.

ROYAL W. IRWIN, of Chicago, for appellee.

MR. JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from a judgment entered in the superior court for $8,500, in favor of plaintiff and against defendant upon the verdict of a jury, because of personal injuries alleged to have been sustained by plaintiff while he was dancing on the dance floor of the defendant corporation.

No question is raised as to the pleadings.

Plaintiff's theory of the case is that while he was in the exercise of due care for his own safety he was caused to fall on the dance floor of the defendant while he, the plaintiff, was dancing thereon; that the injuries which he sustained were caused by defendant's negligence in permitting the dance floor to become in a dangerous and unsafe condition; that the agents and the employees of the defendant immediately prior to a roller skating act, spread and caused to be spread upon said dance floor divers substances and powders which rendered said dance floor unsafe for dancing and that said defendant allowed said powders and substances to remain on said floor for a long period of time and that as a direct and proximate result of the negligence so charged plaintiff was caused to fall.

Defendant's theory is that it did not allow the dance floor to become in a dangerous and unsafe condition while plaintiff was dancing thereon or at any other time; that defendant had no notice of any powder or other substance being on the dance floor prior to plaintiff's fall or had no notice that the dance floor was in an unsafe or dangerous condition; that the agents and employees of the defendant did not spread powder or other substance on the dance floor prior to the appearance of the "roller skating act," nor did the defendant allow powder or other substances to remain on the dance floor for a long period of time; that there was nothing about plaster of Paris powder on a dance floor that would create a dangerous condition; that there is no competent proof in the record to show that a spot of powder on the dance floor caused plaintiff to fall or that any powder that may have been on the dance floor at the time of plaintiff's fall was the same powder that was used in the "roller skating act"; that there is no proof in the record to show that the roller skating artist was an employee or agent of defendant and defendant contends there is no evidence in the record showing that the dance floor was in a dangerous or unsafe condition at any time, nor is there any evidence to show that the defendant had notice that the dance floor was in an unsafe or dangerous condition prior to plaintiff's alleged fall.

The evidence shows that the defendant corporation, Harry's New York Cabaret, Inc., was maintained as a place of amusement and was located at 400 North Wabash avenue in Chicago; that on the second floor of the premises there was a restaurant and dance floor; that the portion of the floor used for dancing was made of ordinary narrow maple flooring, sanded and smooth and highly polished with wax; that the lighting of the place was rather dim; that defendant furnished a floor

show for the amusement of its customers and that the show consisted of music, singing and fancy dancing.

The evidence further shows that as part of the entertainment, defendant had about a week prior to the accident, employed a man by the name of Smith who gave an exhibition in roller skating and that this act had been given at least four times every night during the period of the engagement; that Smith did not skate upon the surface of the dance floor, but used a wooden mat about 10 x 10 feet square and that it was made of narrow strips of maple about three-sixteenths of an inch in thickness glued to some sort of fabric; that because of its construction the mat could only be rolled up in one direction; that when the mat was laid out on the dance floor it was spread out so that the fabric rested on the dance floor and the maple strips were on top where the skating took place; that to prevent his skates from slipping Smith applied powdered plaster of Paris to the mat. Smith testified that the powder was put on the mat to "keep us from slipping and holding us to the floor. It prevents the mat from being slippery. I put it on the mat with a can. It is put on every performance. Approximately about a teaspoonful or a little less is put on each time."

The evidence further shows that as the skating was done only in the center of the mat the powder was sprinkled only over an area of four or five feet; that after the skating act was finished it was the custom to roll the mat downward as it was lying on the dance floor before it was removed; that it had been the practice of the skater and those assisting him to sprinkle plaster of Paris on this mat every time a performance was given and afterward to roll it up in the manner described.

The evidence further shows that on the night of January 21, 1936, the plaintiff drove to Wheeling, Illi-

nois, where he picked up Felix Rogalski and his wife, Rogalski's daughter Blanche and Rogalski's cousin Elsie Rogalski who was their cook; that Felix Rogalski conducted a tavern in Wheeling; that they drove to the Parkway Hotel in Chicago and plaintiff had one drink; that plaintiff then got some money and they took a cab to the "Royal Frolics," on 22nd street, arriving there about 12 o'clock; that plaintiff had three or four "Scotch and sodas" and then some supper; that about 3:00 o'clock the party left for Harry's New York Cabaret, the place conducted by defendant herein, and after their arrival three of them ordered coffee and while sitting there Charles Hepp and Dolores Walker came over to the table; that a skating act had just finished and the skater rolled the mat he had been skating upon and set it to one side; that shortly thereafter some singers came out and sang and a closing chorus of six girls came out and danced; that the last act was the finale and the dancing followed immediately and about 15 couples went onto the dance floor.

The evidence further shows that the dancing continued for about 5 minutes and then there was an encore and the music started again, the orchestra playing a one-step; that Ryan was dancing with Miss Blanche Rogalski; that Felix Rogalski and his wife danced together and Dolores Walker, a witness for plaintiff, danced with a man from Detroit; that the floor was crowded with people; that after the encore the orchestra played a fox trot or a one-step and Ryan and his partner "stepped it up a little bit," and all of a sudden he turned his ankle and fell on his leg; that he was carried to a table and afterward all the party got into a cab and started for Ryan's residence; that from there he took a cab to St. Luke's hospital.

The evidence further shows that the accident happened at 400 North Wabash avenue on the second floor;

that the room was about twice the size of the average courtroom; that on one side of the room was a bar and in the room was a dance floor about 16 feet square; that the dance floor was made up of small boards and the floor was waxed and polished; that it was waxed twice a week by a waxing machine; that at each of the corners of the dance floor was a brick pillar; that the pillars had electric lights hanging from them on the side toward the dance floor and the opposite side; that there were eight lights in all.

Dudley Thomas Moore, a witness on behalf of defendant, testified that he was a chemist and analyzed some of the powder and that it contained 90.9 per cent calcium sulphide and 9.1 per cent of water; that the powder had no abrasive qualities nor was it sticky or adherent.

Frank Smith, the roller skate performer, was called as a witness on behalf of defendant and testified with reference to the powder getting from the mat to the floor that his purpose of sifting the plaster of Paris on the jointed mat was to get traction "it keeps from sliding when you use pressure on it."

Some of the witnesses testified at the trial to having seen some white substance on the floor after the skaters had left.

John F. Ryan, the plaintiff, testified that he was 46 years old and lived at 2100 Lincoln Park West; that on January 21, 1936, while he was dancing in Harry's New York Cabaret, his foot stopped suddenly, it struck something, some sticky substance on the floor and he turned on his ankle and fell on his leg; that he did not see any substance on the floor before or after he had fallen; that he was carried to a table and fainted and was taken to St. Luke's hospital; that his leg had been broken; that he was in the hospital from January 21 to March 2; that he started to walk on his leg sometime

in June; that where the leg was broken it always hurts and when the weather is damp the leg swells up and gets very sore.

Plaintiff further testifying stated that prior to the accident he had an income in excess of $400 per week, which income he lost on account of his permanent injury.

Felix Rogalski, a witness on behalf of plaintiff, testified that at the time in question he was dancing with his wife; that he did not see anything on the floor; that he was not paying any attention; that Mr. Ryan was sober and was dancing with his daughter; that Mr. Ryan fell on the dance floor and was picked up and carried to a taxi and taken to the hospital.

Mrs. Blanche Rogalski, testifying on behalf of plaintiff, stated that they had the Union Hotel at Wheeling and were thinking of putting entertainers in their place and wanted to make some investigations about it; that they went to the Frolics and later to the New York Bar; that there were entertainers there; that she was dancing with her husband and did not see plaintiff fall down and did not notice the floor.

Elsie Rogalski, a witness on behalf of plaintiff, testified that she saw plaintiff fall while he was dancing with Blanche Rogalski; that she did not remember what made him fall; that Mr. Ryan was sober; that she never saw Mr. Ryan drunk.

Dr. John Lindquist, a witness on behalf of plaintiff, testified that he was a physician on the staff of St. Luke's Hospital; that he first met plaintiff while he was in bed at the hospital; that plaintiff was in shock at the time and had a fractured leg; that the tibia and fibula of plaintiff's right leg were broken, a spiral or oblique fracture; that the tibia was broken at about the junction of the lower and middle thirds; that the bone was not projecting through the flesh, but there was a deep laceration over the fractured site, which

made him assume it had been compounded; that there were small fragments there and some comminution; that there was also a fracture of the fibula in the upper third which was also oblique and ran along the shaft of the bone, but was not compounded; that there were small fragments there; that X-ray pictures were taken and examined and plaintiff was removed to the operating room where he was given a local anesthetic and a wire was passed through the bone of the heel, that is the calcaneus, and on that wire a traction apparatus was applied to apply traction to the leg; that the wire used was about a foot long and about the size of a lead pencil; that they made a hole with a drill and it drills the wire through the bone of the heel; that the leg was put in a splint to hold it in position and then the weight pulls the fragments out; that at first about 15 pounds of traction was used and was gradually cut down to 10; that later a complete plaster cast was put on extending from the thigh down to and including the foot; that he was in the hospital from January 21, 1936 until March 2, 1936, when he went to the Parkway Hotel; that at that time he was still in the cast; that on March 13 the doctor testified he took plaintiff back to the hospital and had a lighter cast put on; that plaintiff had two nurses while at the hospital and had one nurse in attendance after he left the hospital and went to the Parkway; that in April the cast was taken off and there was some atrophy of the muscles and plaintiff had to exercise his leg in the bath tub under water as the ability to move the leg is better under water; that the doctor continued to see plaintiff until May and at that time plaintiff still had some stiffness in the joints and there was a tendency of the ankle and foot to swell after the removal of the cast.

Dr. John Lindquist further testifying stated that the usual, reasonable and customary charge for the services which he rendered would be from $500 to $750 and

accommodations at St. Luke's Hospital would be about $10 a day and the nurses' charge would be $7 a day each and board.

Dolores Walker, an employee of defendant and a witness on behalf of plaintiff, testified that she had danced on the floor hundreds of times the week before Ryan was hurt; that the floor was slippery; that it was smooth and shiny; that she did not see anything on the floor until after Ryan fell, when she saw a gray powder on the floor; that there was quite a crowd on the dance floor; that customers fall occasionally on cabaret floors, even before the skating rink was there; that on a crowded floor sometimes people are tripped and pushed.

Charles J. Hepp, called as a witness by plaintiff under section 60 of the Civil Practice Act, Ill. Rev. Stat. 1937, § 184, ch. 110; Jones Ill. Stats. Ann. 104.060, testified that he did not notice any powder on the floor at the time Ryan fell.

Charles J. Hepp, recalled as a witness on behalf of defendant, stated that he did not look at the floor; that he did not look to see if there was any foreign substance on the floor and nothing was said by anybody about any foreign substance being on the floor; that he had seen the skating act and knew they were using powder and had seen some of the powder on the floor, and on some occasions it had been swept up; that he did not know whether they had swept up after every performance or not; that he did see them sweep; that at the time the skating act was on they had a bag of balloons above the floor and some of them would break; that the heat caused them to break and the rubber would drop to the floor and that would be swept up; that plaintiff was not intoxicated.

From this evidence, it appears that plaintiff, a man 46 years of age was a patron in the so-called night club or cabaret of the defendant; that among other entertainment furnished by defendant for its patrons, there

was a dance floor which was kept thoroughly waxed and smooth and was used at defendant's invitation to its patrons for the purpose of dancing; that among the other forms of entertainment furnished by defendant, was a so-called roller skating act which was performed by two artists on a portion of the space reserved for the dance floor, which was 16 feet square, they first having spread out a mat 10 feet wide and 10 feet long which they sprinkled with powder; that the mat when being removed was rolled up and taken from the floor and in rolling the mat up it could only be rolled one way—underneath.

The testimony shows that in order to perform the skating act, it was necessary to overcome the smoothness of the dance floor and that the performers of said skating act with the knowledge of the defendant used plaster of Paris powder on the mat, which was put on the dance floor, in order to get traction for the skating act to keep the skaters on the mat and to keep them and it from sliding and hold the mat to the floor; that the powder prevents the mat from being slippery, from which fact the interference can easily be drawn, and in fact proven, that when the mat was removed some of the powder fell upon the dance floor; that it was the custom that this powder be swept up and the manager of the cabaret saw that this was done at other times than just prior to the accident; that at the time in question he testified that he did not know whether it had been swept up or not, although he was present in the room at the time.

The evidence also shows that plaintiff was sober at the time of the accident and that while dancing, his foot came in contact with some foreign substance on the floor, which was described as the powder which had been applied to the "skating mat," and he was caused thereby to fall to the floor, breaking his leg and ankle.

Where the keeper of a night club or cabaret maintains a dance floor for the use of its patrons, said keeper must use reasonable care to maintain it in a safe

condition for its use for that purpose and this obligation is an affirmative one and continues so long as the dance floor is being used for such purpose. If said keeper permits the floor to be used for any other purpose, such as was done in the instant case—for a skating exhibition or act—it is his duty to see that said floor is restored to a reasonably safe condition before again permitting his patrons to dance upon said floor, so that they will not be injured whilst in the exercise of reasonable care for their own safety.

In the instant case we think it was a question of fact as to whether or not the plaintiff was injured by the negligence of the defendant in permitting the floor to be used for dancing while the plaster of Paris powder used on the skating mat was still upon the dance floor, and what was the proximate cause of plaintiff's injury.

We think the conflicting testimony in this regard was properly left for the jury to consider, and upon which to return their verdict. We think the evidence shows that the powder was placed upon the skating mat for the definite purpose of overcoming the smoothness of the dance floor and that when the mat was removed after the act was finished some of the powder fell upon the dance floor rendering it difficult for dancing. This condition existed without the knowledge of the plaintiff and with the knowledge of the defendant.

Counsel for defendant cite the case of *Davis v. South Side El. R. Co.*, 292 Ill. 378. In that case plaintiff slipped on a banana skin and fell on the stairway leading from the elevated station to the street. The evidence did not show that the company had notice that the skin was on the stairway or that it had been permitted to be upon the stairway for a sufficient time to imply notice. The court at page 386, said: ''If it had been shown that the banana skin had been permitted to be upon the stairway for a sufficient time that notice might be implied or actual knowledge were shown, that might have justified a verdict against the company

under the rule requiring the exercise of ordinary care, but such actual or implied notice was not shown on this record.''

The circumstances in the instant case are decidedly different, the president of the defendant company, Charles Hepp, testified that he knew the skaters were using this powder and he also knew that it was necessary to have it swept off the floor after each skating act, which, at the time of the accident, had not been done. Therefore, the doctrine enunciated in the case from which we have just quoted is not applicable in the instant case.

In this case the manager or president of the company must have known that to permit the powder to remain on the floor was dangerous to patrons who wished to dance, as ordinarily he had it swept from the floor. Plaintiff was dancing at defendant's place of business at defendant's invitation and had every reason to believe that the floor was in a proper and safe condition for dancing. We think the jury was justified in so believing. As was said in *Pauckner v. Wakem,* 231 Ill. 276: ''. . . if appellee was on the premises at the time and place of the accident by the invitation, either express or implied, of appellants, they owed him the duty to exercise ordinary care for his safety while upon said premises.''

Counsel for defendant complains that a witness upon being cross-examined, in answer to a question asked by him, mentioned an insurance company. It appears that the witness had filled out a questionnaire for a brother of defendant's lawyer who was an investigator, and she, the witness, had previously testified that this investigator with whom she was acquainted had filled in the questionnaire and she signed it as he directed. The questions by counsel for defendant and answers made thereto, were as follows:

''Q. You told him he could write up anything he wanted to and you would sign it?

"A. Yes, sir.

"Q. What was the purpose or reason for your telling him that?

"A. Because he had always been ill, never had any work, and he told me he was working for his brother and he was working for an insurance company and they wanted to get an immediate settlement for Mr. Ryan.

"Mr. Crowe: Now, I move to strike that answer, if your Honor please.

"The Court: The answer may be stricken."

The lawyers on both sides then retired to the judge's chambers where the trial judge admonished the witness and explained to her that she should not have mentioned anything about an insurance company. We think the defendant has no cause to complain. The question asked "opened the door" for almost any answer and we think the witness's answer was responsive to the inquiry. However, in excessive caution, the trial judge struck the answer, and as before stated in chambers cautioned the witness against making similar statements. We do not think the rights of the defendant were in any way prejudiced by this incident.

Complaint is made as to the instructions given. None was refused. We think from an examination of them that the jury was fairly instructed as to the law applicable to the facts as developed by the evidence.

We do not think the amount of damages is excessive. The plaintiff was earning between $400 and $500 a week. As a result of his injury he lost his positions and his income and is still unable to earn a living. He incurred considerable expense for doctor's bill, hospital bills and nurses, etc., all of which when considered together with the pain and suffering he underwent as a result of the injury, seem to justify the amount of the verdict and judgment.

The jury saw and heard the witnesses testify and were in a better position to judge as to their credibility than is a court of review.

For the reasons herein given the judgment of the superior court is affirmed.

*Judgment affirmed.*

HEBEL, P. J., and HALL, J., concur.